IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:06-HC-2097-BO

DAVY GENE STEPHENS,                    )
                                       )
            Petitioner,                )
                                       )
    v.                                 )        ORDER
                                       )
GERALD BRANKER, Warden,                )
Central Prison                         )
Raleigh, North Carolina,[1]            )
                                       )
            Respondent.                )

    This matter arises from the petition for writ of habeas corpus filed by Davy Gene Stephens

("Stephens" or "petitioner"). Petitioner is a state inmate convicted of three counts of first-degree

murder and sentenced to death on each count. Presently before the court is respondent's motion for

summary judgment (DE #12) and petitioner's cross-motion for summary judgment on Claim I (DE

#21). The matters are ripe for ruling.

## STATEMENT OF THE CASE

A.    Facts

    Stephens was sentenced to death for the first-degree murders of Lynn Wright, Antwon

Jenkins, and Michael Kent Jones. The following facts are summarized from the trial transcript and

the opinion of the Supreme Court of North Carolina affirming petitioner's convictions and sentences.

State v. Stephens, 347 N.C. 352, 493 S.E.2d 435 (1997).

---

[1] Marvin Polk, former Warden of Central Prison, was named as respondent in the petition.
Since the petition was filed, Gerald Branker has replaced Polk as Warden and will be substituted as
the respondent. See Fed. R. Civ. P. 25(d).

On January 20, 1995, petitioner and his co-perpetrator, William Barrow, had dinner and drank a bottle of Everclear and some whisky. Thereafter, in the early morning hours of January 21, 1995, the men went to the Grill Road home of Lynn Wright, a reputed drug dealer. They entered the house, walked directly to Mr. Wright's bedroom and shot Wright six times, killing him. Petitioner and Barrow left the bedroom and went separate directions. Barrow walked to the front porch and shot Antwon Jenkins in the head, killing him. Next, Barrow shot James White. The bullet grazed White's face, but did not kill him. Petitioner walked to the living room and shot Kenneth Farmer. Farmer was hit in the arm and was not killed. Petitioner next tried to shoot John Wright, but he had run out of bullets. Petitioner and Barrow left the scene, but returned a short time later and continued their attack. Petitioner shot and killed Michael Kent Jones and Barrow shot June Bates. Ms. Bates was hit in the back and arm, but survived. She escaped to a nearby house and called the police.[2]

Victim Kenneth Farmer identified petitioner as one of the shooters. Farmer knew petitioner because petitioner had been to the Grill Road house several times before. Later, Farmer picked petitioner out of a photographic lineup and testified at trial that petitioner was one of the perpetrators. Victim June Bates identified petitioner from a photographic lineup and also identified petitioner at trial as one of the perpetrators.

When arrested, petitioner was hiding in the attic of a house with a .38 special revolver nearby. At trial, the State presented expert testimony that Lynn Wright, Antwon Jenkins, and Michael Kent Jones all died of gunshot wounds. A ballistics expert testified that the revolver found near petitioner in the attic was the gun which fired 4 cartridge casings collected from the murder scene.

At trial, the defense did not put on any evidence at the guilt-innocence phase. At the

---

[2] Hereinafter the murders are referred to collectively as "the Grill Road homicides."

sentencing phase, the defense called lay witnesses and two experts witnesses to present mitigating testimony.

B.    Procedural History

On February 13, 1995, petitioner was indicted for three counts of first-degree murder and two counts of assault with a deadly weapon with intent to kill inflicting serious injury. On March 20, 1995, he was indicted for assault with a deadly weapon with intent to kill. Petitioner was tried at the November 27, 1995, Criminal Session of the Superior Court of Johnston County and found guilty of all charges. After a sentencing trial, the jury recommended the death sentence on all three counts of first-degree murder.[3]  On December 20, 1995, the trial court entered petitioner's death sentences and also sentenced him to sixty-three to eighty-five months imprisonment for each conviction of assault with a deadly weapon with intent to kill inflicting serious injury and twenty-five to thirty-nine months imprisonment for the conviction for assault with a deadly weapon with intent to kill.

On direct appeal, the Supreme Court of North Carolina affirmed petitioner's convictions and sentences. Stephens, 347 N.C. at 371, 493 S.E.2d at 447. Stephens filed a petition for writ of certiorari with the United States Supreme Court which was denied. Stephens v. North Carolina, 52 U.S. 931 (1998).

On April 13, 1999, Stephens filed a motion for appropriate relief ("MAR") in Johnston County Superior Court. After oral argument, but without an evidentiary hearing, the court denied

---

[3] For the murder of Lynn Wright the jury found the aggravating circumstance that the murder was part of a course of conduct in which defendant was engaged and involved violence against other persons. For the murders of Antwon Jenkins and Michael Kent Jones the jury found the aggravating circumstances that the murder was part of a course of conduct in which defendant was engaged and involved violence against other persons and that the murder was committed to avoid lawful arrest. See 5:06-hc-2097 (E.D.N.C.) Docket Entry #23.

the MAR in an order entered on May 2, 2001.[4]  The Supreme Court of North Carolina denied Stephens' petition for a writ of certiorari. State v. Stephens, 354 N.C. 579, 559 S.E.2d 550 (2001).

On May 20, 2002, represented by new counsel, Stephens filed a second MAR. In an order entered on December 6, 2004, the MAR court granted an evidentiary hearing on petitioner's claim that his trial attorney suffered from a conflict of interest, but denied all of the other claims raised in the second MAR.[5]  After the evidentiary hearing was held, the court denied the conflict of interest claim in an order entered on July 28, 2005.[6]  Stephens petitioned for a writ of certiorari, and his petition was denied. State v. Stephens, 360 N.C. 490, 632 S.E.2d 771 (2006).

On May 23, 2006, Stephens filed his petition for writ of habeas corpus with this court. After an initial review of the petition pursuant to Rule 4 of the Rules Governing Section 2254 Cases, the court directed respondent to file a response. On October 12, 2007, respondent filed a motion for summary judgment. On November 29, 2007, petitioner filed a response. On November 30, 2007, petitioner filed a cross-motion for summary judgment on Claim I. The matters are now ripe for ruling.

## DISCUSSION

### A.     Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

The court's review of the claims is governed by 28 U.S.C. § 2254(d), as modified by the

---

[4] Order located in State Ct. R. Vol. 4 of 4, Tab 14.

[5] Order located in State Ct. R. Vol. 4 of 4, Tab 15.

[6] Order located in State Ct. R. Vol. 4 of 4, Tab 16.

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat.

1214 (1996). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Only after a petitioner establishes the state court's adjudication of his claims was "contrary

to" or an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000). Finally, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Id.

B.    Claims

In the petition, Stephens argues he is entitled to habeas relief vacating his convictions and death sentences because of the following errors:

Claim I - Petitioner's trial attorney had an undisclosed conflict of interest that adversely affected his performance;

Claim II - Ineffective assistance of counsel because counsel failed to adequately investigate, develop, and present mitigating evidence;

Claim III - The trial court erred by giving a jury instruction that allowed the jurors to give no weight to the statutory mitigating circumstances;

Claim IV - The prosecutor was allowed to argue that petitioner's failure to testify was evidence of his guilt;

Claim V - Petitioner was precluded from introducing relevant evidence at sentencing in violation of his constitutional rights;

Claim VI - The trial court erred by giving a jury instruction on the weighing of aggravating and mitigating circumstances that relieved the State of its burden of proof at sentencing.

Stephens has exhausted his state-court remedies as to each of these claims as required by 28 U.S.C.

§ 2254(b).

C.   Analysis

    1.    Claim I - Petitioner's trial attorney had an undisclosed conflict of interest that
          adversely affected his performance

    In Claim I, petitioner argues that his constitutional rights were violated because one of his

trial attorneys, Andy Holland, had an undisclosed conflict of interest. Holland was appointed to

represent petitioner along with lead counsel Cynthia Huntsberry after another attorney became ill.[7]

At the time he was appointed, attorney Holland was in private practice. In his practice Holland was

routinely hired to do a wide range of legal work for numerous Johnston County agencies. While

preparing for petitioner's trial, Holland represented the Johnston County Sheriff's Department in an

Equal Employment Opportunity Commission ("EEOC") matter involving employee Wilma Jean

Edwards, and also advised the Sheriff's Department about terminating Ms. Edwards based on her

mishandling of work files.[8] Petitioner's claim is based on Holland's broad legal work on behalf of

_____

    [7] Cynthia Huntsberry was lead counsel for petitioner at trial and Holland was co-counsel.
State Ct. R. Vol. 1 of 1, Tab 2 at 78, 95.

    [8] On June 30, 1995, Ms. Edwards, a data entry specialist, was denied a promotion to deputy.
On July 10, 1995, she filed an EEOC complaint alleging she was denied the promotion based on
gender discrimination. State Ct. R. Vol. 3 of 4, Index Tab 20. On July 13, 1995, attorney Holland
was consulted by Sheriff Freddy Narron and Chief Deputy Ken Smith about the EEOC matter.
Supplement State Ct. R. Vol. 1 of 1, Tab 2 at 49. On July 20, 1995, Holland prepared the Sheriff's
response to the EEOC complaint. State Ct. R. Vol. 3 of 4, Index Tab 1 at 7; State Ct. R. Vol. 10f
1, Tab 2 at 48. Subsequently, in August, the State Bureau of Investigation conducted an
investigation into leaks concerning the activities of the Johnston County Drug Task Force. During
the investigation, attention focused on Edwards, among others, because she had access to
investigative information and search warrants on her computer and declined to take a polygraph.
State Ct. R. Vol. 3 of 4, Index Tab 12. Edwards denied the charges, but on or about September 6,
1995, she was transferred from the Criminal to Civil Division so she would no longer have access
to drug investigative reports and search warrants. Id. After she was transferred, on September 13,
1995, her replacement discovered that a number of official files, including search warrant
applications and investigative reports, had been deleted from Edwards' password-protected
computer. Id. On September 22, 1995, and September 25, 1995, Sheriff Narron and Chief Deputy
Smith again met with attorney Holland regarding Ms. Edwards. Holland advised them about

Case 5:06-hc-02097-BO   Document 24   Filed 09/25/08   Page 7 of 54

numerous county agencies, and petitioner raises particular concern about his work with the Sheriff's Office with respect to Ms. Edwards. In addition, he alleges Holland was suffering from a conflict of interest due to his work for the Johnston County Tax Collector relating to a trailer owned by Angel Guevara and his work for the County Finance Department relating to the death of Deputy Paul West.

To some extent, the issue of a potential conflict of interest was raised at the time of trial. According to Holland, while preparing for trial he became concerned about a possible conflict of interest due to his work for the Johnston County Sheriff's Office on the EEOC matter initiated by Ms. Edwards. He drafted a document entitled "Memorandum of Understanding" for petitioner to sign acknowledging that petitioner had been informed about Holland's representation of the Sheriff's Office in connection with the potential conflict, was satisfied with Holland's services, and was satisfied with Holland's statements that his work on the EEOC case would not impact his representation of petitioner. State Ct. R. Vol. 1 of 4, Index To Exhibits Tab 20. Petitioner signed the Memorandum of Understanding on November 15, 1995. Subsequently, on November 27, 1995, the day petitioner's case was convened for trial, the court addressed the Memorandum of Understanding on the record. State Ct. R. Vol. 1 of 4, Index Tab 21. The court summarized the contents of the Memorandum of Understanding and then briefly questioned petitioner. The court asked petitioner whether it was his signature on the document and whether he was still satisfied with his understanding of Mr. Holland's representation of the Sheriff with respect to the EEOC matter. Id. Petitioner indicated it was his signature, that he was satisfied with his understanding, and that

---

terminating Ms. Edwards and prepared a resignation form for her signature. On September 26, 1995, Ms. Edwards was confronted and admitted deleting the files. She refused to resign and was immediately fired. Edwards subsequently complained to the EEOC that she was fired in retaliation for filing an EEOC complaint. On November 6, 1995, Holland prepared the Sheriff's confidential response to the retaliation charge. State Ct. R. Vol. 3 of 4, Index Tab 12.

Case 5:06-hc-02097-BO    Document 24    Filed 09/25/08    Page 8 of 54

he had nothing to add. Assistant District Attorney Lock then told the court that he and Mr. Holland had contacted a Mr. Edmunson of the North Carolina State Bar and had been advised that it was Edmunson's opinion that Holland's representation of petitioner under the circumstances described would not violate the Rules of Professional Responsibility. Id.

a. Procedural Default

Respondent asserts that petitioner's claim is procedurally defaulted because the arguments were found to be procedurally barred in state court. Under the doctrine of procedural default, a federal court is precluded from reviewing the merits of any claim found to be procedurally barred by the state court on independent and adequate state grounds. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). A state rule is "adequate" if it is firmly established and regularly and consistently applied by the state court. Johnson v. Mississippi, 486 U.S. 578, 587 (1988); McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). A state rule is "independent" if it does not depend upon a federal constitutional ruling. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000) (citing Ake v. Oklahoma, 470 U.S. 68, 74-75 (1985)). Whether a rule is independent and adequate is a matter of federal law. Henry v. Mississippi, 379 U.S. 443, 447 (1965).

Procedurally defaulted claims can be reviewed by a federal habeas court if the petitioner demonstrates cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. To show cause, a petitioner must show something external prevented him from complying with the state procedural rule. Id. at 753. To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law. United States v. Frady, 456 U.S. 152, 167-69 (1982). To establish a "fundamental miscarriage of justice," a petitioner must show he is actually innocent of the charges. Reid v. True, 349 F.3d 788, 806 (4th Cir. 2003); Matthews v. Evatt, 105 F.3d 907, 916 (4th Cir.

9

1997).

Petitioner contends that the procedural bars as applied in his case do not provide independent and adequate grounds to support a procedural default. Alternatively, petitioner argues that if the bars are independent and adequate, he can demonstrate cause and prejudice to overcome the procedural default.[9] As discussed below, the court finds that the arguments of an undisclosed conflict of interest presented as Claim I in the habeas petition were first raised by petitioner in his First Amendment to Second MAR and are not procedurally defaulted.

Petitioner first raised a claim alleging his attorney suffered from a conflict of interest in his MAR. At the time of his first MAR, petitioner was represented by attorneys William Gerrans and William Spence. Petitioner argued that his constitutional rights "were violated by the Court's failure, ex mero motu, to replace defendant's court appointed attorney" because his attorney was also representing the Sheriff of Johnston County before and during his representation of petitioner.[10] MAR at 7. Petitioner argued that when the trial court was alerted to the potential conflict it did not adequately investigate the issue. Petitioner also argued that his constitutional rights were violated by Mr. Holland's failure to withdraw from representing him based on the conflict.

The MAR court denied the claim as procedurally barred on the basis that it could have been, but was not, raised on direct appeal. See May 2, 2001MAR Order at 10, 15. The court found that petitioner failed to show cause and prejudice to overcome the procedural bar. Id. at 15. The court further found that even if the claim was reviewed, it lacked merit. Id. The court determined there

---

[9] Petitioner does not allege he will suffer a fundamental miscarriage of justice if the court does not consider the claim.

[10] This was his full description of the nature of the alleged conflict in the first MAR. See MAR at 7-10. Petitioner argues that he was unable to further develop the claim because trial counsel were not forthcoming with information and he was denied a hearing at which he could subpoena witnesses.

was not an actual conflict of interest and petitioner could not show any adverse effect. Id. at 12. The court found no evidence that Holland failed to act on petitioner's behalf for fear of injuring the Sheriff's office. Id.

Subsequently, in his First Amendment to Second MAR, petitioner raised a claim that trial counsel was "laboring under an undisclosed conflict of interest that adversely affected his performance." First Amendment to Second MAR at 3. At the time of his second MAR, petitioner was represented by new post-conviction counsel, Paul Green and Zephyr Teachout. In making the claim in the second MAR, petitioner noted that when he raised the issue of a conflict in the first MAR "no documents or affidavits were attached to the first MAR, and there was no new information included beyond what was available at the time of trial." Id. at 3. Petitioner contended that through further investigation he had located additional information which showed that Attorney Holland "was under contract to provide an array of legal services to Johnston County and its agencies (including the Sheriff's Department), that was so broad as to make him the *de facto* County Attorney." Id. at 6. He further stated:

Although a single EEOC complaint may have been the only Sheriff's matter pending at the time of Stephens' trial, there was an ongoing attorney-client relationship between Holland and the Sheriff's Department that was much broader, and likely included relationships with the Sheriff's Department personnel, including the Deputies who investigated the crime, arrested defendant, and testified at his trial.

Id. at 6-7.

The MAR court granted petitioner an evidentiary hearing on this claim. See December 6, 2004 MAR Order. After the hearing, in an order entered on July 28, 2005, the MAR court denied the claim. The MAR court held that the claim was procedurally barred. July 28, 2005 MAR Order at 13-14. The court reasoned that the claim was procedurally barred in accordance with N.C. Gen. Stat. § 15A-1419(a)(2) because it was previously raised and denied in petitioner's first MAR. Id.

at 13. The court also found that insofar as petitioner was raising a different claim of conflict of interest, the claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(1) and (a)(3) because it could have been brought on direct appeal or in the first MAR, but petitioner had not done so. Id. The court held that petitioner failed to demonstrate cause and prejudice to overcome the procedural bar. Id. Alternatively, the court held the claim failed on the merits. Id. at 14. The court found that petitioner failed to show an actual conflict of interest. Id. at 16-17. The court also found that petitioner was unable to show that any alleged conflict adversely affected Holland's performance. Id. at 27, 29.

When petitioner initially raised the issue of attorney conflict in his first MAR, he presented the limited argument that his attorney suffered from a conflict of interest because of his work for the Sheriff's Department at the time of trial. Counsel based this claim on the trial record and was apparently referring to Holland's work on the EEOC claim. It was not until the First Amendment to Second MAR that petitioner presented the claim that Holland suffered from an undisclosed conflict of interest due to his work for the county agencies and his more extensive involvement with the Sheriff's Department relating to Ms. Edwards' termination. It is this claim of an undisclosed conflict that he presents as Claim I in the habeas petition.

In ruling on the second MAR, the MAR court held that insofar as the First Amendment to Second MAR presented a different issue of conflict of interest than was presented in the first MAR, it was procedurally barred in accordance with subsections (a)(1) and (a)(3) because it could have been raised on direct appeal or in the first MAR and petitioner had failed to do so. Id. Therefore, the arguments raised in the conflict of interest claim presented to this court were procedurally barred by the MAR court in accordance with subsections (a)(3) and (a)(1).

Petitioner argues that the procedural bars are "indefensible" because the necessary facts were

not in the trial record and were suppressed or concealed by attorney Holland and District Attorney Lock. Br. in Supp. Pet'r Mot. Summ. J. at 22-23. Petitioner argues that the bar is not appropriately applied in his case because he diligently worked to develop the factual basis of the claim at the time of the first MAR, but was precluded from doing so by petitioner's trial counsel and the other parties who had access to the necessary information.

When petitioner's first state post-conviction counsel attempted to gain a greater understanding of the circumstances underlying the Memorandum of Understanding and the potential conflict of interest, neither Holland nor co-counsel, Cynthia Huntsberry, provided any information.[11] Attorney Holland conceded during the evidentiary hearing in 2004 that his response to Mr. Gerrans and Mr. Spence when they were attempting to get information at the time of the first MAR was a letter which was "not done thoroughly, [] not abundantly accurate, and contains a little venom." Evid. Hr'g Tr. at 130.[12] Mr. Holland also unequivocally stated that during the period surrounding the first MAR, Mr. Spence would not have been provided any of the information which counsel for petitioner obtained during the preparation of the second MAR. Id.

Mr. Gerrans, co-counsel with Mr. Spence during the first MAR, testified that when he interviewed Mr. Holland, Holland did not make him aware that he did legal work for numerous Johnston County agencies. Id. at 183, 186. The record also reflects that Mr. Gerrans attempted to get information and documents from Ms. Huntsberry while preparing the first MAR, but was not able to do so and was told that petitioner's case file could not be located. Id. at 184. At the evidentiary hearing during the second MAR, Mr. Gerrans was shown the response to the EEOC

---

[11] Counsel on direct appeal cannot be faulted for any failure to research beyond the record on direct appeal because under North Carolina procedural rules a direct appeal is limited to review solely upon the record on appeal and the transcripts of the proceedings. See N.C. R. App. P. 9(a).

[12] The transcript of the hearing is located in the Supp. to State Ct. R. Vol. 1 of 1 Tab 2.

Case 5:06-hc-02097-BO   Document 24   Filed 09/25/08   Page 13 of 54

complaint prepared by Mr. Holland (marked at the evidentiary hearing as Defendant's Exhibit 12). Mr. Gerrans testified that despite his efforts to get information from Holland about his work for the Sheriff's Department and having subpoenaed such information, he had never before seen the document (which indicated that Holland may have been involved in the firing of an employee, Ms. Edwards, of the Sheriff's Department for destroying records). Id. at 196. Mr. Gerrans testified that Holland had only told him about an EEOC matter which lead him to believe Holland was just involved in that one matter for the Sheriff's Department. Id.

Efforts by petitioner's first post-conviction team to discover information from sources other than trial counsel were similarly unsuccessful. They could not get information from the EEOC and they were told by the Sheriff's Department that because there was a different Sheriff, the Department would not have records related to the EEOC claim. Id. at 180, 182. Because other tactics were not successful, Mr. Gerrans subpoenaed several people to appear at the oral argument set by the MAR court during the first MAR.[13] However, because the session was scheduled for the court to hear argument, not as a full evidentiary hearing, Mr. Gerrans and Mr. Spence were never allowed to call the witnesses to give or proffer evidence. Id. at 190-94.

According to statements made by Mr. Green, counsel for petitioner on the second MAR, it was only when he saw a newspaper article referring to Holland representing Johnston County in another matter that Green realized Holland's work might have been more extensive than Holland had

---

[13] Mr. Gerrans could not recall everyone he had subpoenaed, but he did recall issuing subpoenas to Mr. Holland, Ms. Huntsberry, the Sheriff's Department, and the former Sheriff, Mr. Narron. The subpoenas requested all documents, reports or files dealing with Holland's representation of the Johnston County Sheriff or the Johnston County Sheriff's Department. Evid. Hr'g Tr. at 186-87. When Ms. Huntsberry appeared in court in response to the subpoena, she had a file on petitioner's case that she previously indicated she was not able to locate. Id. at 190. Mr. Gerrans also recalled that Mr. Holland brought some documents. Id.

previously implied.[14] State Ct. Rec. Vol. 10 of 10, Tab 4 at 29. Then during the second MAR, although Holland had refused to prepare an affidavit for petitioner's counsel at the time of the first MAR, Holland signed an affidavit prepared by the State. The affidavit included information about Holland's work for numerous Johnston County agencies. Id. at 29-30. Subsequently, the MAR court scheduled the evidentiary hearing and petitioner's counsel once again tried to obtain documents from the Sheriff's Department. Although during the first MAR they told petitioner's counsel they did not have any documents, in response to the new request, the Sheriff's Department produced documents about Ms. Edwards' EEOC case and firing. Id. at 31-32.

North Carolina General Statute § 15A-1419(a)(3) provides that a motion for appropriate relief must be denied when "upon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." North Carolina Rule of Appellate Procedure 9(a) limits appellate review to the record on appeal. Petitioner's claim alleging an undisclosed conflict of interest clearly relies on facts and evidence not in the record on appeal, and could not have been raised on direct appeal. Therefore, the procedural bar based on N.C. Gen. Stat. § 15A-1419(a)(3) for failing to raise the claim on appeal is not an independent and adequate basis to support a procedural default in this court. Further, petitioner is correct that N.C. Gen. Stat. § 15A-1419(a)(1) is also insufficient to support a default of his claim. Subsection 1419(a)(1) provides that a MAR may be procedurally barred when "[u]pon a previous motion . . . the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." No evidence has been presented by respondent to dispute petitioner's account of the obstacles faced by petitioner's counsel which precluded him from raising the issue prior to the

---

[14] The statements by Green were made to the MAR court during argument related to the evidentiary hearing on the second MAR. See State Ct. R. Vo. 10 of 10, Tab 4 at 29.

second MAR. Therefore, the record demonstrates that the factual basis for the claim of an undisclosed conflict of interest was not reasonably available to counsel at the time of the direct appeal or first MAR, but only became available at the time of the second MAR. Although subsections 1419(a)(1) and (a)(3) may in some instances support procedural default of a claim of conflict of interest, they will not bar review under the circumstances presented in petitioner's case. See Reid v. True, 349 F.3d 788, 805 (4th Cir. 2003) (question is not whether the bar is generally adequate, but whether it is adequate as applied in a particular case). Consequently, petitioner has shown that a procedural default should not apply to his claim that attorney Holland suffered from an undisclosed conflict of interest and the court will address the claim on the merits.

b. Merits

In addressing the merits, the court recognizes that the MAR court not only found the matter to be procedurally barred, but alternatively ruled that petitioner's claim lacked merit. Therefore, the court is not undertaking a *de novo* review, but must first consider whether petitioner can show that the MAR court's ruling is based upon an unreasonable determination of the facts or amounts to an unreasonable application of clearly established federal law. See 28 U.S. § 2254(d).

The Sixth Amendment right to effective assistance of counsel includes the right to assistance free from conflicts. Strickland v. Washington, 466 U.S. at 668, 688 (1984). A petitioner alleging that his Sixth Amendment rights were violated because his attorney was affected by a conflict of interest must show more than the possibility of a conflict. A petitioner must show that an actual conflict existed and that the conflict adversely affected counsel's performance. Mickens v. Taylor, 535 U.S. 162, 174 (2002); Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). An actual conflict is one "*that affected counsel's performance* - as opposed to a mere theoretical division of loyalties." Mickens, 535 U.S. at 171 (emphasis in original). Once a petitioner shows an actual conflict

adversely affected his representation by counsel, prejudice is presumed, and he is entitled to relief. Cuyler, 446 U.S. at 349-50; Rubin v. Gee, 292 F.3d 396, 401-02 (4th Cir. 2002). To show an actual conflict of interest, a petitioner "'must show that [his] interests diverged with respect to a material factual or legal issue or to a course of action.'" United States v. Nicholson, 475 F.3d 241 (2007) (quoting Gilbert v. Moore, 134 F.3d 642, 652 (4th Cir. 1998)).

In addition to Holland's work for the Sheriff's Department related to Ms. Edwards' EEOC case and termination, petitioner cites to the work Holland routinely did for numerous other Johnston County agencies as a source of Holland's conflict of interest. Petitioner also argues that work Holland did for the Johnston County Tax Collector on a case involving a man name Angel Guevara and work he did for the County Finance Department related to the death of Deputy West show Holland suffered from a conflict of interest.

First, the court considers petitioner's arguments with respect to Holland's routine work for numerous Johnston County agencies. There is no question that around and during the time he represented petitioner, Holland did a substantial amount of work for various Johnston County agencies.[15] While petitioner makes much of this fact, he cannot show Holland suffered from a

---

[15] At the evidentiary hearing on the second MAR Holland testified about his work. Holland explained that he was not the County Attorney, but in his private practice he did substantial work for Johnston County agencies. Evid. Hr'g at 30. He was the designated attorney for the Department of Social Services and the Johnston County Child Support Enforcement Agency. Id. at 29-30. Additionally, he explained that the County Managers would call and ask him to do work on behalf of other county agencies. Id. at 30-31. He represented the Johnston County Tax Collector, did title searches for water and sewer lines for the County Manager's Office, and represented the Johnston County Planning Board. Id. at 31-33, 39. He said that after handling EEOC complaints for the Department of Social Services, EEOC matters from all county offices seemed to be referred to him, including those arising in the Sheriff's Office. Id. at 31-33. He said that he also handled personnel grievances from county employees who's complaints reached the level of the County Manager. Id. at 34. However, he explained that the Sheriff's Office was an independent department and he "didn't have a lot of involvement with the Sheriff's Office and their personnel." Id. at 38. He said that he also became involved in computer contracts for the County Manager and from this did some work on contracts for computers for the Sheriff's Department. Id. at 41. He also said that sometimes in

17

conflict of interest on the basis of any of this work. Insofar as Holland did work for the Johnston County Department of Social Services, the Johnston County Child Support Enforcement Agency, the Johnston County Tax Collector, the County Manager's Office, and the Planning Board, there is no suggestion that petitioner had cases or issues before any of these county agencies or that these agencies were somehow involved in his prosecution. Although petitioner had child support issues, none of petitioner's obligations involved Johnston County or the Johnston County Child Support Enforcement Agency for whom Holland did work. Consequently, Holland's general work for Johnston County Department of Social Services, the Johnston County Child Support Enforcement Agency, the Johnston County Tax Collector, the County Manager's Office, and the Planning Board presented no conflict of interest with his representation of petitioner.

Similarly, petitioner cannot demonstrate an actual conflict of interest because Holland represented the Johnston County Tax Collector in the action involving seizure of Angel Guevara's mobile home or because he provided advice to the County Finance Department about the dispersal of insurance proceeds to Deputy West's family while he was also representing petitioner. Mr. Guevara was charged with murdering Johnston County Deputy Paul West after West responded to a domestic dispute. Deputy West was one of the first officers on the scene the night of the Grill Road homicides. Guevara's mobile home, as the scene of Deputy West's murder, was impounded. In the course of his work on behalf of the Johnston County Tax Collector, Holland was asked to have Guevara's mobile home released from impoundment so it could be sold to satisfy a tax obligation. In working to have the mobile home released, Holland represented to the court that he had spoken with Guevara's attorney, that defense counsel had examined the mobile home, and there was no

_____

his work with Social Services he did work with the Sheriff's Office relating to child custody orders. Id. at 55.

18

longer a need for the mobile home to be impounded. Holland was later found to be in contempt of court and fined when the court learned that Guevara's attorneys had not examined the mobile home.[16] With respect to his work for the County Finance Department, Holland said that after Deputy West was killed Holland was contacted by the County Finance Department about the dispersal of insurance proceeds. Several of Deputy West's family members were claiming a right to the money and Holland was asked for advice about how the money should be distributed. Evid. Hr'g Tr. at 51-53.

Petitioner cannot show that Holland suffered from an actual conflict of interest based on his work for the Tax Collector or the County Finance Department. The murder of Deputy West occurred months after the Grill Road homicides and there is no suggestion by petitioner or any information before this court to suggest that West's murder was related in any manner to the Grill Road homicides. Holland's work for the Tax Collector and the Finance Department had no bearing on petitioner's case and did not present divergent interests from his work on petitioner's case.[17]

Therefore, the issue of whether Holland suffered from an actual conflict of interest violating petitioner's Sixth Amendment rights centers on Holland's work for the Sheriff's Department, primarily with regard to the EEOC claim and dismissal of Wilma Jean Edwards, but also from Holland's work on other matters for the Sheriff's Department such as his review of computer contracts and his availability to consult with the Sheriff's Department about out-of-state child custody judgments.

---

[16] Holland stated that he had actually been told by another individual that the defense attorneys had already examined the mobile home and did not need it anymore.

[17] While Deputy West's murder eliminated a likely witness at trial, Attorney Holland's work relating to payment of death benefits obviously had no bearing on that fact and did not conflict in any manner with his work on petitioner's case.

Even if the court were to assume petitioner could demonstrate an actual conflict of interest arising from this work, petitioner is unable to establish an adverse effect.[18] To demonstrate an adverse effect a defendant must: 1) identify a plausible alternative defense strategy or tactic that the defense could have used; 2) show the alternative strategy was objectively reasonable; and, 3) establish that counsel's failure to pursue the alternative strategy was linked to the actual conflict. See Mickens, 240 F.3d at 361.

Petitioner asserts he was adversely affected by Holland's work for the Sheriff's Department because his trial attorneys did not fully pursue the stated defense of showing that the Sheriff's Department was partly to blame for the murders because they were aware of the drug activity at the Grill Road house, but failed to do anything about it or were in cahoots with the victims. Petitioner does not contend there was a different defense that was bypassed because of the alleged conflict. Petitioner only argues that his attorneys did not fully or adequately pursue the stated theory of

---

[18] As previously noted, to some extent, Holland's work on behalf of the Sheriff's Department was disclosed to petitioner. The record shows that Holland brought his representation of the Sheriff's Department in the EEOC matter to the attention of petitioner and the trial court prior to trial. Supplement State Ct. R. Vol. 2 of 8 at 4-6.

Further, to the extent that Holland worked on Edwards's termination, petitioner's characterization of the extent of Holland's knowledge of the details of the files she deleted and the potential relationship to petitioner's case far oversteps the facts as determined by the state court. Despite petitioner's representation that Holland was aware that Ms. Edwards' misconduct may have related to petitioner's case, the MAR court did not find that to be the case.

At the evidentiary hearing on the second MAR, Holland testified that he was not involved in the alleged internal SBI investigation involving Wilma Jean Edwards. Evid. Hr'g Tr. at 122-23; July 28, 2005 MAR Order at 21-22. Holland testified that he filed a response to the claim of retaliation filed by Ms. Edwards, which he referred to as the EEOC claim, and in doing so provided information about why she was discharged. However, he said that his explanation about why she was discharged was based solely on a report he was provided by the Sheriff. Holland testified that he was not aware there were documents relating to Ms. Edwards dismissal which referred to the fact the some of the files she had improperly deleted related to a triple homicide case. Evid. Hr'g Tr. at 101, 110-11, 113.

attacking the Sheriff's Department.[19]

In support, petitioner argues that counsel did not call Detective Berube as a witness at trial and elicited very little information about prior investigations of the Grill Road house or Detective Berube's involvement from the officers who were questioned at trial. Prior to the murders, Detective Berube had been investigating drug activity at the Grill Road house and was at the Grill Road location less than an hour before the murders. Petitioner further argues that Holland failed to elicit information at trial showing: there was an employee in the Sheriff's Department who had improperly handled confidential information and information underlying search warrants; there had been at least one leak of information about a January 12, 1995, raid of the Grill Road house;that Detective Berube, who was in charge of January 12th raid, had been at the Grill Road house a half hour before the murders; that an employee of the Sheriff's Department had been fired for improperly deleting files and she had come to the attention of the SBI during an investigation of leaks from the drug task force; and that the employee fired for deleting files had access to documents related to the Grill Road homicides. Petitioner asserts that in preparation for trial, counsel could have more adequately investigated the SBI investigation into leaks from the drug task force, obtained records related to the leaks of information and destruction of files at the Sheriff's Department, determined what records relating to the Grill Road murders had been destroyed, and interviewed Sheriff's Department employees.

At the evidentiary hearing on the second MAR, Mr. Holland explained that before trial the defense became aware that Wright's neighbors had alerted the Sheriff's Department about the high volume of traffic going in and out of the Grill Road home. Evid. Hr'g Tr. at 74-75. Holland said

---

[19] The transcripts from trial indicate the defense also tried to challenge the reliability of the identifications of petitioner as the perpetrator and attacked the accuracy of the ballistics report.

that they decided to investigate to learn how many calls the Sheriff's office had gotten, what the Sheriff's office was doing about it, and how many times officers had been to the house. Id. at 75. Holland explained that the defense had little to work with factually and he:

> Came up with a theory . . . that if I could present to the jury sufficient evidence that the Sheriff's Department had not done their job, that they were in cahoots with all of these people, that none of this would have ever happened, I thought that might be a defense that would get us an opportunity to divert attention. The so-called rabbit rule of defense attorneys: send enough rabbits out in different directions, and maybe one of the jurors will follow it.

Id. at 75-76.

In pursuing this defense, counsel contacted Detective Berube because Detective Berube had been conducting surveillance of the Grill Road house the night of the murders. Id. at 76-78. Holland said he initially had a difficult time getting to speak with Berube but after he called the judge or the district attorney, Berube was ordered to meet with Holland and co-counsel Ms. Huntsberry. Id. at 78. Holland recalled that they spoke with Berube at length about his surveillance of the Grill Road House. Id. Holland said that he had the impression Berube did not have anything to hide. Id. at 79.

The record also reflects that before trial the investigator for the defense, Randy McCloud, questioned neighbors to find out about activity at the Grill Road House and complaints lodged with the Sheriff's Department. Id. at 79-81. The defense's investigation indicated that at least one search warrant was previously issued for the Grill Road house, a warrant dated January 12, 1995, involving Detective Berube. Id. at 83.

In his opening statement at trial, Holland stated that the evidence would show that the Grill Road house was a crack house being investigated by the Sheriff's department. State Ct. R. Vol. 8 of 8 at 189. He said that the Sheriff's Department had been there with search warrants investigating the home and that although the house had been under surveillance, petitioner was not seen going into or out of the home. Id. at 189-90. He further argued that:

We contend to you evidence will further show to you that this house was visited by a member of Johnston County Sheriff's Department, Officer Buddy Berube, at 1:15 a.m. on the early morning hours of January 21, 1995. Mr. Stubbs indicated to you, in his table of contents, that occurred sometime around 2:00 a.m. that same morning. The facts, we contend you will find – or will show that this had been a drug house for quite some time, to the terror of people who lived in that area.

Id. at 190.

In cross-examining the State's witnesses the defense attempted to get into evidence the reputation of the Grill Road house as a crack house and the fact that the house had previously been raided and was part of a drug investigation. Defense counsel questioned several of the victims and one of Wright's neighbors to establish that the Grill Road house was a known drug house that had previously been raided and under investigation by the police. See State Ct. R. Vol. 3 of 10 at 96-99, 5, 103-04, 131.

The defense also attempted to raise questions about Detective Berube, noting his work on the drug task force, that he had been at the Grill Road house shortly before the murder, and implying something was questionable about his behavior. Angela Lee, one of the officers who assisted at the scene the night of the crimes, was questioned to establish that she had been assigned to work with Buddy Berube on the drug task force. State Ct. R. Vol. 2 of 10 at 119-120. She was also questioned about the proximity of Berube's home to the crime scene. Id. at 120. She was questioned to show that while working as an undercover agent for the task force she had made undercover drug buys from the victim, Lynn Wright. Id. at 121-22. She was also questioned and asked to identify an application for a search warrant for November 9, 1994, for the Grill Road home. Id. at 123-24.

Mr. Holland questioned Deputy Miller who's regular patrol area included the Grill Road address. Miller was asked whether he was aware the Grill Road house was a "known crack house in the neighborhood" and whether he was given any instructions to go by the house everyday. Id. at 38-39. During the questioning of Deputy Miller, Holland also asked about Buddy Berube and

showed that he lived only three miles from the scene of the murders. Id. at 141-142.

Detective Eatman, one of the investigators on the case, was cross-examined as to whether he was familiar with the fact that three search warrants had been previously issued for the Grill Road location and that Lynn Wright had charges pending at the time of the murders. State Ct. R. Vol. 4 of 10 at 131. He was questioned to establish that Buddy Berube worked for the Sheriff's Department and lived close to the murder scene. Id. at 137. Counsel also questioned Eatman as to whether Berube had been at the scene of the murders earlier in the day. Id. 137-38.

Similarly, defense counsel attempted to ask Detective Hinton whether his investigation showed Detective Berube had been at the scene of the murders at 1:15 a.m., but the State objected and the objection was sustained. Counsel tried to pursue a line of questioning about Berube's presence at the Grill Road location, but the State continued to object and the court sustained the objections. Defense counsel also asked Detective Hinton whether Berube was ever questioned in connection with the murder investigation. Id. at 174. In closing, Holland tried to undermine the accuracy and reliability of the identifications of petitioner as one of the perpetrators. In doing so, he stressed that the house was a "crack house" and that as a drug house, the men who worked out of the home would have been armed. State Ct. R. Vol. 5 of 10 at 193-94.

Petitioner is unable to show that any deficiencies in developing and presenting the stated defense were a result of Holland's relationship with the Sheriff's department or the result of a conflict of interest. Despite petitioner's claim that counsel did not adequately pursue the stated defense, the record shows that defense counsel developed and presented evidence that the Sheriff's Department was aware of the on-going drug activity, but had failed to curb it. There is no indication that Holland tried to avoid attacking the Sheriff's Department or Detective Berube. As the record reflects, counsel attempted to get evidence before the jurors showing that the house had been under

24

investigation and tried to show that Detective Berube had been at the Grill Road home only thirty minutes before the murders. The defense also tried to imply that something was suspicious because Berube did not immediately respond to the scene despite living nearby. In fact, the defense tried to develop more evidence to raise suspicion about Berube and his involvement, but was limited when the court sustained the State's objections to defense counsels' questions. It was the unavailability of further evidence to support the theory, not a duty to the Sheriff's Department that precluded more of an attack on the Sheriff's Department or Berube. Moreover, as Holland testified at the hearing, he and Ms. Huntsberry ultimately concluded that the theory was not going to be successful and backed away from it. Nothing petitioner has presented suggests that this was in any way influenced by Holland's work for the Sheriff's Department.

In his brief in support of his motion for summary judgment, petitioner makes much of the defense's failure to call Berube as a witness at trial or to cross-examine other officers more about his involvement. However, the court notes that when counsel had the opportunity to develop his claim at the evidentiary hearing in state court, Berube was never called as a witness and the other officers were never called or questioned about some of the alleged inconsistent testimony which petitioner now contends Holland should have cross-examined them about. Petitioner, with the benefit of hindsight and time to identify inconsistencies, attacks trial counsels' efforts, but offers little more than conjecture about why the defense failed to ask several questions on cross-examination or call Berube as a witness.[20] In fact, it is not surprising that the defense did not call

---

[20] Although Deputy Miller was apparently mistaken in responding to a question about whether he had contact with Berube, counsel's failure to cross-examine him about this cannot show an adverse effect. Further, although Sergeant Warren recalled that Detective Hinton was the first detective on the scene, there is no indication that Warren had contact with Berube first. Detective Hinton arrived at the scene only seven minutes after Berube and Hinton was the on call detective and the lead detective on the case. State Ct. Rec. Vol. 2 of 19 at 88; St. Ct. Rec. Vol. 4 of 10 at 144-45.

Berube as a witness at trial. As notes prepared by Berube in January 1995 shortly after the murder indicate, Berube was a witness who could have offered damaging information against petitioner. See St. Court Rec. Vol. 3 of 4 Tab 13, Index Tab 5. Berube was one of many officers assisting at the crime scene, worked to identify the perpetrators, and participated in petitioner's arrest during which a gun, later identified as one of the murder weapons, was seized.[21]

Further, while petitioner attacks counsel for failing to present information about the SBI investigation into the leak of internal information and Ms. Edwards destruction of records, Holland testified that he was not aware of information at the time of trial that the destruction of records by Ms. Edwards could possibly involve petitioner's case.[22] Evid. Hr'g Tr. at 101, 110-11, 113, 122-23. The MAR court order acknowledged that Holland testified as such. July 28, 2005 MAR Order at 21-22. While petitioner might disagree, he has not rebutted this evidence.

c. Discovery and Evidentiary Hearing

Finally, the court considers petitioner's request for leave to conduct discovery and his request for an evidentiary hearing on this claim. Rule 6 of the Rules Governing Section 2254 Cases provides that leave shall be granted to conduct discovery under the Federal Rules of Civil Procedure upon a showing of "good cause" by the petitioner. A petitioner shows "good cause" by presenting specific allegations that if fully developed would entitle him to relief. Bracy v. Gramley, 520 U.S. 899 (1997). A federal habeas court must allow an "evidentiary hearing only where a factual dispute, *if*

_____

[21] Petitioner attempts to make much of the fact that Berube was one of the officers who arrested petitioner and was present when the gun was found. However, Berube was one of eight to ten officers at the scene. See State Ct. R. Vol. 3 of 10 at 137. When petitioner came out of the attic to surrender, Detective Berube and two other officers moved him to the living room. Id. at 143. It was Detective Hicks who entered and searched the attic for any evidence and located the gun. Id.; State Ct. R. Vol. 4 of 10 at 118-19.

[22] Neither Ms. Edwards, Detective Berube nor any other person was determined to be the source of the leak. Evid. Hr'g Tr. at 154-55.

Case 5:06-hc-02097-BO   Document 24   Filed 09/25/08   Page 26 of 54

*resolved in petitioner's favor*, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing." Rector v. Johnson, 120 F.3d 551, 562-63 (5th Cir. 1997).

With respect to the discovery request, petitioner contends that the SBI may still possess records that may contain information about the destruction of investigation records in the Sheriff's department that could relate to the Grill Road homicides. Petition at 26. Petitioner offers no more than speculation that additional information may exist and cannot show good cause for discovery to develop this claim. Nor can petitioner show that an evidentiary hearing is warranted. During state post-conviction proceedings petitioner was afforded a full evidentiary hearing on this claim. Although he may disagree with the state court's determination, he fails to demonstrate that a factual dispute remains that requires an evidentiary hearing.

Accordingly, petitioner cannot show he is entitled to further proceedings on this claim and cannot show he is entitled to relief. He is unable to show the MAR court made an unreasonable determination of the facts, or that its ruling is contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim I is granted and petitioner's cross-motion for summary judgment as to Claim I is denied.

2. Claim II - Ineffective assistance of counsel because counsel failed to adequately investigate, develop, and present mitigating evidence

In Claim II, petitioner argues that he received ineffective assistance of counsel because trial counsel failed to adequately investigate, develop, and present mitigating evidence at sentencing. Petitioner argues that there was a far stronger case in mitigation to be made than the one presented by counsel at sentencing. Petitioner argues that post-conviction counsel obtained petitioner's employment and school records which contained significant mitigating evidence and discovered detailed information showing a family history of severe mental illness and abuse. Petitioner argues that this information is significant because it would have allowed Dr. Strahl, petitioner's psychiatric

27

expert at trial, to provide a stronger opinion than he did at sentencing. Petitioner contends that trial counsel's failure to obtain and use this information was objectively unreasonable and there is a reasonable probability that the error impacted the result at sentencing. Petitioner also argues that he received ineffective assistance of counsel because Robert Brewington, the psychological expert used by the defense at trial, had once been a suspect in a widely publicized unsolved murder case.[23]

As an initial matter, insofar as petitioner argues that he received ineffective assistance of counsel because his trial attorneys hired Robert Brewington, petitioner's claim is procedurally barred. Petitioner first raised this argument in his second MAR as Claim 15. In ruling on the claim, the MAR court held it was procedurally barred because petitioner was in a position to raise it on direct appeal and in his first MAR, but failed to do so. As discussed pursuant to Claim I, under the doctrine of procedural default a federal court is precluded from reviewing the merits of any claim found to be procedurally barred by the state court on independent and adequate state grounds. Coleman, 501 U.S. at 731-32.

N.C. Gen Stat. § 15A-1419(a)(1) provides that a motion for appropriate relief must be denied where: "[u]pon a previous motion . . . the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." Subsection 1419(a)(1) is an independent and adequate basis for procedural default of a claim of ineffective assistance of counsel. See Thomas v. Polk, 176 Fed. Appx. 377, 381 (4th Cir. 2006); see also Bacon v. Lee, 225 F.3d 470, 476 (4th Cir. 2000).

In response to respondent's contention that Claim II in the habeas petition is procedurally

---

[23] Six years before petitioner's trial, Mr. Brewington had been questioned in the murder of Phyllis Estep. While driving on the highway in Johnston County, Estep was shot with a shotgun and killed. During the investigation into her murder it was revealed that Dr. Brewington had a sexual relationship with Estep, who was his patient, and she had threatened legal action. Brewington was investigated as a possible suspect, but presented evidence of an alibi and was never charged.

defaulted, petitioner does not specifically address the procedural bar insofar as it applies to his argument about Robert Brewington. In general with respect to his ineffective assistance of counsel claim, petitioner asserts that the procedural bar should not preclude federal review because the state court failed to consider his argument that attempts to develop the claim during the first MAR were thwarted by trial counsels' lack of cooperation and by appointment of post-conviction counsel unfamiliar with state post-conviction pleading requirements. He asserts that the issue should be independently considered at an evidentiary hearing both to determine whether the bar is independent and adequate and to determine cause and prejudice. Pet'r Resp. to Resp't. Mot. Summ. J. at 4-5.

This argument cannot overcome the procedural bar with respect to the argument about Robert Brewington. Petitioner fails to provide any basis for the court to determine that N.C. Gen. Stat. § 1419(a)(1) is not regularly and consistently applied to an ineffective assistance of counsel argument of this nature and his arguments cannot establish cause and prejudice to overcome the default. The murder case in which Brewington was questioned was widely publicized and occurred six years before petitioner's trial. Petitioner cannot show that under these circumstances he was not in a position to raise this argument at the time of his first MAR. Moreover, petitioner's assertion that trial counsel was not cooperative cannot excuse his failure to raise this particular argument in the first MAR. It is not whether additional evidence would have made the claim easier to raise, but whether at the time of the default the claim was available at all. See McCarver, 221 F.3d at 591 (citing Smith v. Murray, 477 U.S. 527, 537 (1986)). The argument, based on media accounts of Brewington's link to the Estep case and the fact that Brewington was petitioner's expert at trial, did not require information from trial counsel to be raised.

Similarly, petitioner cannot establish grounds to overcome the default based on the alleged inexperience of his first post-conviction attorneys. Petitioner argues that his first post-conviction

attorneys did not understand the need to submit affidavits and other such evidence in support of the petition, but mistakenly believed they would automatically have an opportunity to develop such evidence at an evidentiary hearing. However, this argument has no bearing on the procedural bar of the argument relating to Brewington because this argument was not raised in any form until the second MAR. It is not counsel's failure to properly support it at the time of the first MAR, but the total failure to raise the argument until the second MAR that lead to the procedural bar. Moreover, petitioner cannot show cause to excuse a procedural default based on the alleged inexperience or deficiency of post-conviction counsel. See Gray v. Branker, 529 F.3d 220, 242 (4th Cir. 2008); Mackall v. Angelone, 131 F.3d 442, 449 (4th Cir. 1997).

The court now turns to petitioner's remaining arguments in support of this claim. Petitioner argues that he received ineffective assistance of counsel because there was a substantial amount of mitigating evidence that was never used by counsel at trial. Petitioner argues that the new evidence is significant because it "would have allowed Dr. Strahl to render a stronger opinion than he actually did at the sentencing hearing" and "would have given the sentencing jury a firm evidentiary foundation for statutory and nonstatutory mitigating circumstances..." Petition at 35. He contends that effective representation by counsel would have produced a different result at sentencing. Id.

Respondent also contends that these arguments are procedurally defaulted. In the petition, petitioner acknowledges the state court found the ineffective assistance claim was procedurally barred, but argues the state bars are "neither adequate nor independent as a matter of federal law." Id. at 36, ¶ 101. In his response to respondent's motion for summary judgment, petitioner addresses the issue of procedural bar by stating:

> Regarding the state court's finding of procedural bar and refusal to find state cause and prejudice, there is no factual basis set forth in the state court order beyond the bare existence of the prior proceedings in the case. The state court order does not reflect any consideration of Petitioner's contention that his attempts to develop and

present evidence in support of Claim II during the first MAR proceeding were thwarted by trial counsel's lack of cooperation and failure to provide initial postconviction counsel with Petitioner's complete file, and by the state court's appointment of initial postconviction counsel who was unfamiliar with basic state postconviction pleading requirements.

Pet'r Resp. to Resp't. Mot. Summ. J. at 4-5. This is petitioner's total argument in support of his position that his arguments are not procedurally defaulted.[24]

The arguments asserting ineffective assistance of counsel in the investigation and presentation of mitigating evidence raised in Claim II of the petition before this court are a combination of the arguments presented by petitioner in Claims 13 and part of Claim 14 in the second MAR.[25] In ruling on the second MAR, the court found that Claim 13 was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(1) and (a)(3) because it could have been raised on direct appeal or in the first MAR, but was not. December 6, 2004 MAR Order at 11. The court found that Claim 14 was procedurally barred in accordance with N.C. Gen. Stat. § 15A-1419(a)(2) because it was previously raised as Claim II in petitioner's first MAR. Id. at 12. The court also stated that assuming Claim 14 presented a different claim than raised in Claim II, it was procedurally barred because it could have been raised in the first MAR, but was not. Id. Alternatively, the MAR court held that both Claim 13 and Claim 14 lacked merit. Id. at 11, 14.

Insofar as the arguments raised in Claim 14 in the second MAR were procedurally barred under subsection 15A-1419(a)(2), they are not procedurally defaulted. See Brown v. Lee, 319 F.3d

---

[24] Petitioner does not argue that the failure to excuse the default will result in a fundamental miscarriage of justice.

[25] In Claim 13 in his second MAR, petitioner argued that trial counsel failed to provide the mental health expert with information regarding the facts of Stephens' crimes, his child support obligations, his parents' mental health problems, and Stephens' school records. In Claim 14 in his second MAR, petitioner argued that trial counsel were ineffective because the failed to investigate and present mitigating evidence at the sentencing phase and failed to investigate and present evidence in support of a mental health defense at the guilt/innocence phase.

31

162, 170 n.2 (4th Cir. 2003) (subsection 1419(a)(2) is not a proper ground upon which to base a procedural default). However, the court found that the arguments in Claim 14 were the same arguments raised in Claim 2 in the first MAR, and Claim 2 was found to be procedurally barred pursuant to N.C. Gen. Stat. 15A-1419(a)(3) because the court determined it could have been, but was not, raised on direct appeal. Therefore, all of the arguments asserted in Claim II of the habeas petition were found to be procedurally barred in state court on the basis that they could have been, but were not raised on direct appeal. See N.C. Gen. Stat. § 15A-1419(a)(3).

Subsection 15A-1419(a)(3) is an independent and adequate basis for procedural default of a claim of ineffective assistance of counsel. See McCarver, 221 F.3d at 589; Williams, 146 F.3d at 217-18. To overcome the procedural bar, petitioner argues that his attempts to develop the claim of ineffective assistance of counsel in his first MAR were "thwarted by trial counsel's lack of cooperation and failure to provide initial postconviction counsel with Petitioner's complete file, and by the state court's appointment of initial postconviction counsel who was unfamiliar with basic state postconviction pleading requirements." Response at 5. These arguments fail to address in any manner the rulings of the MAR court that the claims were procedurally barred on the basis that they could have been, but were not raised on direct appeal. See N.C. Gen. Stat. § 15A-1419(a)(3). Petitioner fails to present any grounds to show why the procedural bar based on subsection 1419(a)(3) is not an independent and adequate basis to support the procedural default in this particular case and fails to establish cause and prejudice to overcome the default on this basis. Therefore, the court finds that the claim is procedurally defaulted.

The portions of Claim II first raised in Claim 13 in the second MAR were also found to be procedurally barred under N.C. Gen. Stat. § 15A-1419(a)(1). Subsection 1419(a)(1) is an independent and adequate basis for procedural default of a claim of ineffective assistance of counsel.

See Thomas, 176 Fed. Appx. at 381; Bacon, 225 F.3d at 476. Petitioner is similarly unable to establish grounds to avoid a procedural default of those arguments found to be procedurally barred under N.C. Gen. Stat. § 15A-1419(a)(1). First, insofar as petitioner argues about the alleged deficiency of his first post-conviction attorneys, he cannot establish grounds to excuse the default. Ineffective assistance of counsel on post-conviction cannot be cause to excuse procedural default See Mackall, 131 F.3d at 449. Further, petitioner cannot show cause based on the alleged lack of cooperation by his trial attorneys during the period of his first MAR. The attorneys at the time of the first MAR had everything necessary to raise the claim based on the transcript of sentencing showing what was presented in mitigation and their own investigation showing other available mitigating evidence. Petitioner is unable to demonstrate that trial counsel's lack of cooperation precluded him from raising the arguments. The issue is whether the claim was available, not whether it could have been easier to raise. See McCarver, 221 F.3d at 592. Consequently, Claim II in the habeas petition is procedurally defaulted.

Alternatively, the court finds that petitioner is unable he show he is entitled to relief based on his argument that counsel were deficient in their investigation and presentation of mitigating evidence. To establish ineffective assistance of counsel, a petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a capital sentencing proceeding, the question with respect to prejudice is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695. The court must judge the reasonableness of counsel's performance based upon the specific facts of the case, viewed as of the time of counsel's conduct.

Id. at 690. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91 (1955)).

Petitioner argues that counsel acted objectively unreasonable in failing to thoroughly prepare for the capital sentencing hearing in violation of Strickland; Williams v. Taylor, 529 U.S. 362 (2000); Wiggins v. Smith, 539 U.S. 510 (2003); and Rompilla v. Breard, 545 U.S. 374 (2005). In support, petitioner argues there was additional mitigating evidence not developed or presented by trial counsel that would have made a far stronger case in mitigation. Petitioner asserts that post-conviction counsel obtained petitioner's employment records and records of child support enforcement proceedings which showed that at the time of the murders petitioner was under tremendous pressure from delinquency notices, wage garnishment, and loss of employment. Petition at 32. Post-conviction counsel also obtained petitioner's school records which showed a history of poor performance, disciplinary problems, numerous absences, and that petitioner dropped out of school in the beginning of the ninth grade to become an auto mechanic. Id. at 32-33. Post-conviction counsel obtained information from Dorothea Dix and family members indicating petitioner's parents suffered from mental illness. The records indicate that petitioner's father had been committed to Dorothea Dix as a result of paranoid schizophrenia when petitioner was nine and petitioner's mother was later committed for severe depression and because she had tried to kill herself. The records also refer to family accounts indicating that petitioner's father was an alcoholic who subjected the family to verbal and physical abuse.

According to petitioner, post-conviction counsel provided this newly obtained information to Dr. Strahl. Dr. Strahl was also given information that was known to trial counsel, but not

34

previously provided to Dr. Strahl, including the statement of co-defendant Barrow that he and Stephens, who is 5 feet 6 inches tall and weighed 130 pounds, had not only been drinking the night of the murder, but had consumed $100 worth of crack. In light of this additional information, Dr. Strahl signed an affidavit that he would now testify that Stephens' ability to form a premeditated and deliberate intent to kill was markedly diminished, that he was under the influence of mental and emotional disturbance, that the capacity to appreciate the criminality of his conduct and conform his conduct to the law were diminished, and that his dysfunctional home life, his father's abuse of family members, and his family history of mental health problems played a role in bringing about his criminal conduct. See Strahl Aff. at 5.[26]

Petitioner cannot show that the MAR court's ruling with respect to this claim is an unreasonable application of clearly established federal law. In contrast to the cases he cites, petitioner cannot show that his trial attorneys acted objectively unreasonable in their investigation and presentation of mitigating evidence or that any alleged error in the mitigation case could have reasonably impacted the jury's sentencing.

At the sentencing phase of trial, defense counsel called lay witnesses to testify about petitioner's family background, childhood, and adult life prior to the crimes. Petitioner's sisters, Patricia Perry and Linda Denton, testified about the family history. Ms. Perry talked about petitioner's worry over child support and the tremendous stress it was causing him. State Ct. R. Vol. 6 of 10 at 114-15, 117 124-126. She described her brother as a loving person and indicated that losing their mother in 1990 and then their father in 1993 had upset him greatly. Id. at 115, 113. She described their family as loving and said they never lacked for clothing or food. Id. at 116-17. Ms. Denton indicated that when she was young her father had been treated at Dorothea Dix. Id. at 135.

---

[26] Located in State Ct. R. Vol. 2 of 4 Tab 12, Index Tab 16.

She said that she and petitioner's girlfriend, Debbie Jordan, had spoken about petitioner's emotional state about a week before the murders. Ms. Denton indicated that at times petitioner seemed paranoid and exhibited behavior similar to what her father had displayed. Id. at 135-36.

Debbie Jordan, petitioner's girlfriend, was also called to testify.[27] Ms. Jordan testified that after the death of petitioner's father, petitioner started acting paranoid, always thinking someone was after him and said he heard voices. Id. at 164-166. Ms. Jordan testified that petitioner and Barrow consumed at least a pint of Everclear alcohol the evening before the murders along with some other alcohol. Id. at 188-89. Ms. Jordan also testified about the stress petitioner was under because of his child support obligations. Id. at 170, 200-01.

A police detective was called and testified about petitioner's lack of a serious criminal record or history. Id. at 204-05. Ms. Fry, a pastor at Calvary Baptist Temple, testified that she had been acquainted with petitioner's mother and visited her throughout her many illnesses. State Ct. R. Vol. 7 of 10 at 59-60. She said she knew petitioner and knew he helped care for his mother before her death. She said she had observed the strain that his mother's illness placed on the family, including petitioner. Id. at 61-62.

Robert Brewington, a psychologist, was called to testify as an expert witness. Mr. Brewington testified that from his interviews with petitioner he learned that petitioner had a long history of alcohol and drug abuse beginning at age seventeen. Id. at 7-8. He said that petitioner reported he could not remember exactly what he used the night of the murder, but did recall being extremely intoxicated from Everclear alcohol. Id. at 8. Mr. Brewington indicated that petitioner had an I.Q. of 86, which is in the range of lower average intelligence. Id. at 7. Mr. Brewington

---

[27] In some places in the record she is referred to as Debbie Rathbone, which was her name at one time. State Ct. R. Vol. 6 of 10 at 161.

36

Case 5:06-hc-02097-BO Document 24 Filed 09/25/08 Page 36 of 54

gave petitioner the MMPI test and said that from the test and clinical interviews, petitioner's profile revealed he was very anxious and depressed, had a high propensity for alcohol and drug abuse, and a high probability of paranoia. Id. at 10-11. Mr. Brewington testified that the MMPI test indicated petitioner might be a paranoid schizophrenic, but he said petitioner did not seem that severe when he was interviewed. However, he did think petitioner at least suffered from a paranoid personality disorder. Id. at 11. Based on his examination of petitioner and the tests, he recommended petitioner have an extensive psychological evaluation. Id. at 13.

Finally, Dr. Nathan Strahl, a board certified psychiatrist, testified at sentencing. Id. at 63. Dr. Strahl testified he had diagnosed petitioner with "an alcohol dependent problem, with a cocaine dependent problem and some marijuana use which was at the abuse level." Id. at 78. He noted that in evaluating petitioner he learned petitioner had "a father who used substances and had mental health problems and had been hospitalized at Dorothea Dix for what appeared to be some type of paranoid disorder." Id. at 71. He also found petitioner had a paranoid personality disorder.

Dr. Strahl testified that based on what petitioner told him about his alcohol use on the night of the murder and his inability to remember anything after a certain point, he believed petitioner suffered an alcoholic blackout. Id. at 112-13. He explained that it is one symptom of severe alcohol dependence which is what petitioner suffered from. Id. at 109. Dr. Strahl further testified that petitioner, "without any history of any real dangerous type of behavior could have under such impact of alcohol had reduced inhibition and poor judgment that could have led to such a crime to be committed." Id. at 114. Dr. Strahl stated that with continued treatment petitioner could make progress with his personality disorder. He also stated that although petitioner had at times had suicidal thoughts, he had no history of violence directed toward others prior to being charged with the instant offense. Id. at 119. Dr. Strahl testified it was his opinion that on the night of the murders,

petitioner had a diminished capacity to appreciate the criminality of his conduct. Id. at 121. He also testified that while petitioner may have been able to premeditate, under the influence of alcohol he "would make lousy judgments, poor judgments that would result in things that he might not do otherwise." Id. During cross-examination, Dr. Strahl testified that he purposely did not speak with petitioner's family to confirm the information petitioner was telling him. Id. at 130, 141.

On re-direct, Dr. Strahl again referenced that petitioner's father had problems with alcohol use and suffered from paranoid thinking which resulted in a long hospitalization at Dorothea Dix. Id. at 143-44. He expressed how the combination of alcohol and drug abuse by petitioner over time resulted in petitioner being in a "Mr. Jekyll and Dr. Hyde kind of a situation." Id. at 146. He explained that petitioner was likely a very different person when he was under the influence of alcohol and drugs as compared to when he was without alcohol and drugs in his system. Id. at 146-47.

Petitioner cannot show that the MAR court's ruling with respect to this claim is based upon an unreasonable determination of the facts or an unreasonable application of clearly established federal law. Petitioner's case is distinguishable from the situations presented in the Supreme Court cases to which he cites. In Williams, Rompilla, and Wiggins, counsel failed to conduct reasonable investigations that would have produced substantial records and evidence showing that the petitioners in those cases had suffered extreme abuse and neglect. In contrast, the record reflects that petitioner's counsel investigated, developed, and presented a sound case in mitigation. The transcript indicates that counsel presented lay and expert witnesses to develop a picture of a person who was generally caring and non-violent, but who had snapped when he committed the murders as a result of alcohol abuse, paranoia, and anxiety. Defense counsel retained two experts who testified about petitioner's I.Q., alcohol and drug abuse, and petitioner's paranoid personality

38

disorder. During this testimony, the jury also heard evidence that petitioner's father had been hospitalized at Dorothea Dix for mental health problems related to paranoia. Despite petitioner's complaints that information about his background only came in through the experts stating what petitioner had told them, the lay witnesses, especially Ms. Jordan, presented evidence corroborating petitioner's accounts of his alcohol and drug abuse. The lay witnesses also presented information about the stress petitioner was under from his ever increasing child support issues and the loss of both his parents in the course of a few years.

Moreover, much of the information petitioner argues should have been presented was known at the time of trial and presented to the jury, just not in the exact form petitioner now believes it should have been. For example, petitioner argues that counsel failed to present employment records that could have been used to show he was under substantial stress from having his wages garnished for child support. However, the jury heard significant evidence through the testimony of his sisters and his girlfriend about petitioner's child support obligations, his legal problems related to his failure to pay child support, and the stress it was causing him. Petitioner argues that records from Dorothea Dix could have been used to show that his father was an alcoholic who inflicted verbal abuse on the family and who had been committed to Dorothea Dix. Yet, the jury heard some evidence, and Dr. Strahl was aware in reaching his opinion, that petitioner's father suffered from mental health problems with paranoia and had been hospitalized at Dix. To the extent that petitioner argues his other siblings or employers may have provided additional evidence of his family history or stress due to child support, he cannot show counsel were deficient under the Sixth Amendment.

Further, petitioner is unable to show the MAR court acted unreasonably by holding there was not a reasonable probability that, absent any alleged errors by counsel, the result of sentencing would have been different. To show prejudice, it is not enough for a party to show "some conceivable effect

39

on the outcome." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008) (quoting Strickland, 466 U.S. at 693). In reaching its sentencing decision, the jury heard evidence of petitioner's abuse of drugs and alcohol, that he was considered to suffer from alcohol and cocaine dependency, that he was exhibiting signs of paranoia and distrust, and was under great stress, including the threat of incarceration, for failure to pay child support. However, there was also unequivocal testimony from the defense expert that petitioner was not delusional and he had not been diagnosed with paranoid schizophrenia like his father. Given the brutal and unprovoked nature of the attack, there is not a reasonable probability of a different outcome had petitioner presented the evidence he now alleges was available. The jurors were aware of the details of the offense, including the overwhelming evidence of petitioner's responsibility for injuring and killing the victims, the deliberate nature of the shootings, and that some of the victims had been killed after petitioner left, but then returned to the scene, apparently in an attempt to eliminate any witnesses. Under these circumstances, petitioner cannot show the MAR court erred by finding he could not show prejudice under Strickland.

Finally, petitioner, who was not granted an evidentiary hearing on his claims of ineffective assistance of counsel in state court, argues he should be granted a hearing on this claim to present evidence of the merits and address the alleged insufficiency of the procedural bar. A federal habeas court must allow an "evidentiary hearing only where a factual dispute, *if resolved in petitioner's favor*, would entitle him to relief." Rector, 120 F.3d at 562-63. Petitioner fails to show such a factual dispute with respect to Claim II and is unable to show an evidentiary hearing is warranted.

Accordingly, respondent's motion for summary judgment as to Claim II is granted.

### 3. Claim III - The trial court erred by giving a jury instruction that allowed the jurors to give no weight to the statutory mitigating circumstances

In Claim III, petitioner argues that the trial court erred by giving the jury an instruction which unconstitutionally allowed them to give no weight to the statutory mitigating circumstances.

Specifically, petitioner asserts that in conjunction with instructing on the (f)(1) statutory mitigating factor that petitioner had no significant history of prior criminal activity, the court erred by instructing the jury "to answer yes as to mitigating circumstances if one juror finds a mitigating circumstances and deems it to be mitigating." State Ct. R. Vol. 8 of 10 at 92. Petitioner argues that the error was reinforced throughout the sentencing instructions and that under the totality of the circumstances the jurors would have believed they were not required to give any weight to statutory mitigating circumstances, even if proven to exist. In making his argument, petitioner cites to Lockett v. Ohio, 438 U.S. 586 (1978), and Eddings v. Oklahoma, 455 U.S. 104, 114 (1983), for the premise that sentencing juries must be allowed to consider relevant mitigating evidence.

Petitioner first raised this argument on direct appeal, and the Supreme Court of North Carolina denied the claim on the merits. Stephens, 347 N.C. at 358-81, 493 S.E.2d at 439-40.[28] The state court found that reading the trial court's instructions as a whole, the instructions in question could not have confused the jury about the standard applicable to statutory and nonstatutory mitigating circumstances. Id. at 358-59, 493 S.E.2d at 439. It stated that "a reasonable interpretation of the instructions, construed contextually, could not have misled jurors to believe they could disregard any statutory mitigating circumstances found to exist." Id. Petitioner argues that the ruling of the Supreme Court of North Carolina is based upon an unreasonable construction of the factual record, and is contrary to, and an unreasonable application of, clearly established federal constitutional law.

In instructing the jury, the trial court gave separate instructions on the mitigating

---

[28] Respondent argues that petitioner's claim as presented in state court only relied upon state law and did not present a federal constitutional issue. However, respondent is incorrect. Although the state court only relied upon state law in denying the claim, petitioner cited to Eddings v. Oklahoma, 455 U.S. 104 (1982), in raising his claim. See State Ct. R. Vol. 10 fo 10, Tab 5 at 22.

circumstances with respect to each of the three murders. Three statutory mitigating factors were submitted with respect to the murder of Lynn Wright, four statutory mitigating factors were submitted with respect to the murder of Antwon Jenkins, and three statutory mitigating factors were submitted with respect to the murder of Michael Kent Jones. In general, for each of the statutory mitigating circumstances the trial court instructed the jury consistent with the North Carolina pattern jury instruction stating that they should consider the circumstance and "[i]f one or more of you finds by a preponderance of the evidence that this circumstance exists, you would so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the Issues and Recommendation Form. If none of you find this circumstance to exist, you would so indicate by having your foreperson write no in that space." See State Court Rec. Vol. 8 of 10 at 93-94, 118-120, 144-146.

However, with respect to the murder of Lynn Wright, the trial court stated with respect to the statutory mitigating factor that petitioner had no significant prior criminal history:

> It is your duty to consider the following mitigating circumstances and any other which you find from the evidence.
> One: Consider whether the Defendant has no significant history of prior criminal activity before the date of the murder. . . . If one or more of you finds by a preponderance of the evidence that this circumstance exists you would so indicate by having your foreperson write, yes, in the space provided after this mitigating circumstances [sic] on the Issues and Recommendation Form.
> If none of you find this circumstance to exist, you would so indicate by having your foreperson write no in that space. Again ladies and gentlemen, in regard to mitigating circumstances. The foreperson is to answer yes as to mitigating circumstances if one juror finds a mitigating circumstance and **deems** it to be mitigating. If none of you so find, only in that instance would the foreperson write no in the space provided as to mitigating circumstances.

Id. at 92.[29] At all other times with respect to the murder of Lynn Wright the court instructed in

---

[29] The jury found this statutory mitigating circumstance to exist for each of the murders, including the murder of Lynn Wright.

keeping with the pattern jury instruction.

> During the initial instruction with respect to the murder of Antwon Jenkins, the court stated:

> Now, ladies and gentlemen, again I instruct you the foreperson is to answer yes by any mitigating circumstance if any one juror finds that circumstance and **deems** it to be mitigating. The foreperson will only answer no beside a mitigating circumstance if none of you find that circumstance and none of you **deem** it to be mitigating. Ladies and gentlemen, it is you duty to consider the following mitigating circumstances and any others which you find from the evidence.

Id. at 117. Using the language from the North Carolina pattern jury instruction, the court then

proceeded to properly instruct on all four of the statutory mitigating factors for the murder of Antwon

Jenkins.

> During the initial instruction with respect to the murder of Michael Kent Jones, the court

stated:

> Your answers to this on this particular Issues and Recommendation Form, ladies and gentlemen, again I tell you the foreperson is to answer yes by any mitigating circumstance if any one juror finds a mitigating circumstance and **deems** it to be mitigating. The foreperson will answer no beside a mitigating circumstance only if none of your members find the mitigating circumstance and none of you **deem** it to be – or none of you find that circumstances and none of you deem it be mitigating.

Id. at 142-43. Using the language from the North Carolina pattern jury instruction, the court then

proceeded to properly instruct the jury on all three of the statutory mitigating factors for the murder

of Michael Kent Jones.[30]

Petitioner is unable to show he is entitled to relief on the basis of this claim. Petitioner is

correct that in accordance with well established federal law, jurors in a capital case may not be

prevented from considering "any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

Lockett, 438 U.S. at 604. However, "[t]here is simply no constitutional requirement that a

---

[30] No objections were raised at trial.

sentencing jury must give effect or value to any evidence offered in mitigation." Williams v. French, 146 F.2d 203, 216 n.15 (4th Cir. 1998) (citing Johnson v. Texas 509 U.S. 350, 368 (1993)). As long as the mitigating evidence is within "the effective reach of the sentencer," the Eighth Amendment is satisfied. Graham v. Collins, 506 U.S. 461, 475 (1993).

When a petitioner argues that an instruction prevented a jury from considering mitigating evidence, the court must determine "whether there is a reasonable likelihood the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990). The alleged error in the instruction must be reviewed in the context of the overall charge. Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

Considering the jury instruction as a whole, the record supports the state court's determination that there is not a reasonable likelihood the instruction misinformed the jury that they could disregard any statutory mitigating circumstance found to exist. The instruction, in its entirety, would not have lead the jurors to believe they could disregard the statutory mitigating factors they found to exist. In the instant case, the court's instruction did not place any of the mitigating evidence beyond the reach of the jury, but rather properly directed the jurors to consider all of the mitigating factors and any other evidence it considered mitigating.[31]

Nor can petitioner show he is entitled to federal habeas relief insofar as he relies upon state law to argue that an instruction which allows jurors to give no weight to statutory mitigating circumstances found to exist is reversible error. In conducting federal habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). An error in the application of state law is

---

[31] The wording on the Issues and Recommendation form also properly guided the jury in its consideration of the mitigating factors.

not grounds for federal habeas relief unless it violates specific constitutional provisions or is so

egregious as to render the entire trial fundamentally unfair, thus violating the Due Process Clause

of the Fourteenth Amendment. Id.; Howard v. Moore, 131 F.3d 399, 415 n.18 (4th Cir. 1997);

Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993).[32] Even assuming petitioner could overcome the

state court's determination that the instruction did not violate North Carolina law, petitioner is

unable to show that the alleged error rises to the level of a due process violation or rendered the trial

fundamentally unfair.

Accordingly, petitioner is unable to show that the ruling of the Supreme Court of North

Carolina is based upon an unreasonable determination of the factual record or is contrary to, or an

unreasonable application of, clearly established federal law. Respondent's motion for summary

judgment as to Claim III is granted.

4.    Claim IV - The prosecutor was allowed to argue that petitioner's failure to testify was
       evidence of his guilt in violation of the Fifth and Fourteenth Amendments

In Claim IV, petitioner argues that the prosecutor improperly commented on his failure to

testify. Petitioner first raised this claim on direct appeal, and it was denied on the merits by the

Supreme Court of North Carolina. Stephens, 347 N.C. at 361, 493 S.E.2d at 440-41. The state court

reasoned that the statements of which petitioner complained did not refer to petitioner's failure to

testify, but brought attention to the fact that certain evidence presented by the State was not rebutted

by the defense. Id. Petitioner argues that the state court's treatment of this claim is based upon an

unreasonable determination of the facts, and is contrary to, and an unreasonable application of,

clearly established federal law.

_____

[32] In fact, in Estelle, the Court found the petitioner was not entitled to federal habeas relief
because an instruction may have been incorrect under state law. See Estelle, 502 U.S. at 71.

Petitioner argues that the following portion of the closing argument at the guilt phase of trial

unconstitutionally referred to his failure to testify:

> Mr. Lock: The defense may raise other challenges to our evidence when they argue
> to you but I have a challenge. I challenge them to explain why their client was found
> in an attic - - -
>
> Mr. Holland: Objection
>
> The Court: Overruled.
>
> Mr. Lock: – with one of the murder weapons located just inches from him if he's not
> guilty.

State Ct. R. Vol. 5 of 10 at 163-64. Petitioner argues that at the sentencing phase the prosecutor

improperly faulted petitioner for failing to testify and explain himself by arguing:

> Mr. Stubbs: Yes the Defendant must somehow try to minimize his responsibility for
> his actions. To explain why he used and abused alcohol. To explain why he injected
> cocaine, marijuana, mushrooms, methamphetamine, Xanax, and so forth into his
> body. To explain to you what may have been wrong with him on that horribly violent
> night in January.

State Ct. R. Vol. 8 of 10 at 32.

It is unconstitutional for a prosecutor to comment on the silence of the defendant. Griffin

v. California, 380 U.S. 609, 615 (1965); Bates v. Lee, 308 F.3d 411, 420 (4th Cir. 2002). To

determine whether a prosecutor's statement improperly refers to the silence of the defendant, the

court considers whether the language was "intended to be, or was . . . of such character that the jury

would naturally and necessarily take it to be a comment on the failure of the defendant to testify."

United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973). The statements must be considered

in context. United States v. Francis, 82 F.3d 77 (4th Cir. 1996).

Petitioner is unable to show that the Supreme Court of North Carolina acted unreasonably

in determining the facts or acted contrary to federal law by holding that the arguments did not violate

petitioner's constitutional rights. Considering the language in context clearly reveals that the

prosecutors were not commenting on petitioner's silence. The statements at the guilt phase were intended to highlight the fact that the defense, in presenting its case and arguing petitioner was not guilty, had not provided an explanation inconsistent with petitioner's guilt for the highly damaging evidence that petitioner was arrested hiding in an attic with one of the murder weapons. The Fourth Circuit has held that statements referring to "uncontradicted" evidence are not an improper reference to the defendant's failure to testify. See Francis, 82 F.3d at 79. The statements at the sentencing phase, considered in context, were an attempt to discount the expert testimony and mitigating evidence presented by the defense. The argument asked the jury to recognize that at the sentencing phase the defense had no choice but to try to present evidence in an attempt to explain, and hopefully thereby mitigate, petitioner's violent behavior. Nothing in the statements at either phase indicate they were intended to be, or that the jury would necessarily understand them as, comments on petitioner's failure to testify.

Accordingly, petitioner cannot show the Supreme Court of North Carolina's ruling is based upon an unreasonable determination of the facts, or is contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim IV is granted.

5.      Claim V - Petitioner was precluded from introducing relevant evidence at sentencing in violation of his constitutional rights

In Claim V, petitioner argues the trial court prevented him from introducing relevant mitigating evidence at the sentencing hearing. Petitioner argues that the trial court improperly excluded evidence from the testimony of Debbie Jordan tending to show that co-defendant Barrow had pawned his wife's rings at the Grill Road house where the murders were committed in exchange for crack cocaine and that Barrow was under pressure from his wife to get the rings back. Petitioner argues this evidence would have shown that Barrow had a motive to initiate the confrontation with

Lynn Wright and was relevant to the jury's consideration of Stephens' culpability. He contends it was relevant to the submission of the mitigating factor that he played only a minor role in the murders and the plan was initiated by Barrow.

Petitioner first presented this issue on direct appeal, and the Supreme Court of North Carolina denied the claim on the merits. Stephens, 347 N.C. 363-64, 493 S.E.2d at 442. The court held that the evidence was irrelevant and hearsay. The court recognized that under the rules applicable to sentencing proceedings hearsay may be admissible, but such evidence must be relevant and bear indicia of reliability. Id., 493 S.E.2d at 442. It held that the evidence was not relevant because it failed to establish the rings were a motivating factor for the crime. Id. at 364, 493 S.E.2d at 442. Petitioner argues that the state court's treatment of this issue is based upon an unreasonable construction of the factual record and is contrary to, or an unreasonable application of, clearly established federal law.

At trial, in considering whether the evidence about the rings was admissible, the trial court allowed the defense to proffer testimony:

Mrs. Huntsberry: The night that this happened earlier in the evening, did you see William and Teresa?

Ms. Jordan: Yes, ma'am.

Q: What did you do with them?

A: She had supper fixed and asked us to eat and we ate.

Q: Did you have some discussion regarding her rings?

A: Yes.

Q: Who was present?

A: Myself, Davy, Teresa, and William.

Q: All four of you?

A: Yes, ma'am.

Q: Where were they?

A: She told me they were at Lynn Wright's house.

Q: Was there any discussion regarding obtaining these rings back?

A: She was concerned about her rings getting gone.

Q: Was there any discussion about what it would take to get the rings back?

A: No.

Q: Did she tell you who had taken her rings to Lynn Wright?

A: Yes.

Q: Who was that?

A: William.

Q: Throughout this discussion, was Davy present?

A: Yes.

Q: At the time you were at Teresa's, did he and William drink?

A: Yes, ma'am.

Q: Do you recall what they drank?

A: Yes, ma'am.

Q: What did they drink?

A: Everclear.

Q: Was that all?

A: I think they drank something else but I honestly don't remember what.

Q: How much Everclear did they drink, if you know?

A: I know a whole bottle, I don't know what it is called, a fifth or what, but I know

it was a whole bottle.

Q: Approximately what time was this?

A: About 7:00, 7:30 maybe.

Q: 7:30 that evening?

A: Uh huh [yes].

Q: Did you know – did you know of anything about Lynn Wright and his habit of taking items to pawn?

A: I just, yes, I know he done that.

Q: Did you know that through – just through your conversations with Davy or through any other way?

A: Davy, Teresa and William.

Q: So it wasn't the result of any contact between you and Lynn Wright?

A: No, ma'am.

Q: That's all I have.

State Ct. R. Vol. 6 of 10. at 180-82. The trial court found that the testimony seemed to have "little if any probative value of any sort, as to mitigating factors and mitigating circumstances." Id. at 184. The court noted that the evidence, which was based on hearsay, showed little more than the rings were pawned. Id.

In Lockett v. Ohio, 438 U.S. 586 (1978), the Supreme Court held that in a capital sentencing proceeding, the jury must have an opportunity to consider as a mitigating factor "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604. A trial court violates the Eighth and Fourteenth Amendments if it precludes or limits the jury's consideration of such evidence. Id. A state court's exclusion of evidence may violate the Due Process Clause if the

evidence is "highly relevant to a critical issue" and "substantial reasons exist . . . to assume its reliability." Green v. Georgia, 442 U.S. 95, 97 (1978) (per curiam). But the exclusion of evidence that lacks "inherent reliability" when no "compelling circumstances" exist does not violate the Due Process Clause. Buchanan v. Angelone, 103 F.3d 344, 349 (4th Cir. 1996); see also Huffington v. Nuff, 140 F.3d 572, 585 (4th Cir. 1998) (finding no due process violation where evidence excluded by state court lacked "vitality and reliability").

Petitioner contends that the trial court improperly excluded the evidence because it was relevant to assessing whether petitioner was less culpable because it was Barrow who had the motive to initiate the crimes in order to get back the rings he had pawned. However, as the state court determined, the evidence proffered by petitioner shows only that Jordan was told that Barrow pawned his wife's rings to Lynn Wright. There is no evidence or indication from Jordan's testimony, or any other evidence presented by the defense, that Barrow was trying to get the rings back, that the rings were the motive for the attack, or that Barrow was the one who instigated the attack.[33] The court in Lockett specifically noted that nothing in its opinion "limit[ed] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Lockett, 438 U.S. at 604 n.12. Accordingly, petitioner is unable to show that the Supreme Court of North Carolina made an unreasonable determination of the facts or acted contrary to clearly established federal law in ruling that the evidence was properly excluded. Respondent's motion for summary judgment as to Claim V is granted.

      6.     Claim VI - The trial court erred by giving a jury instruction on the weighing of aggravating and mitigating circumstances that relieved the State of its burden of

---

[33] In fact, even assuming it could be shown the rings were the motive for the attack, given the nature of Jordan's proffered testimony it can be equally argued that after hearing about the rings during supper, petitioner suggested to Barrow that they go to Wright's and get the rings back by force.

### proof at sentencing

In Claim VI, petitioner argues that the jury instructions on the weighing of aggravating and mitigating circumstances unconstitutionally relieved the State of its burden of proof and failed to ensure the jurors gave full and fair consideration of the mitigating evidence. Petitioner argues the jury was improperly instructed it had a "duty" to impose the death penalty if it found the mitigating circumstances were "insufficient to outweigh" the aggravating circumstances and the aggravating circumstances were sufficiently substantial to call for the death penalty.

Petitioner first raised this argument in two claims on direct appeal.[34] In Claim VII on direct appeal, he attacked the use of the word "duty" with respect to the instruction on Issue 4. In Claim VIII on direct appeal, he attacked the court's language with respect to Issue 3 that the jurors were to consider whether they found "that the mitigating circumstance or circumstances found is or are insufficient to outweigh the aggravating circumstance[s]." Both claims were raised as preservation issues. Petitioner acknowledged that the language used by the trial court was based on North Carolina's pattern jury instruction and previously had been upheld by the Supreme Court of North Carolina. The Supreme Court of North Carolina denied the claims finding no reason to depart from its prior holdings. Stephens, 347 N.C. at 366-67, 493 S.E.2d at 444. Petitioner contends that the state court's treatment of the claims is based upon an unreasonable construction of the factual record and is contrary to, or an unreasonable application of, clearly established federal law.

The trial court instructed the jurors in pertinent part with respect the murder of Lynn Wright

---

[34] Respondent argues that because petitioner did not cite to Kansas v. Marsh in his appellate brief that the constitutional issue presented in Marsh was not raised on direct appeal and is procedurally barred. However, petitioner stated in raising the claim on direct appeal that the trial court erred by instructing the jury that mitigating circumstances must outweigh aggravating circumstances and "[t]hese instructions violated Defendant's constitutional right to due process of law and to be free from cruel and unusual punishment pursuant to the Eight and Fourteenth Amendments to the United States Constitution." See State Ct. R. Vol. 10 fo 10, Tab 5 at 62.

on Issue 3:

> Issue 3 is: do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is or are insufficient to outweigh the aggravating circumstance found by you? If you find by the evidence one or more of the mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances . . . . If you unanimously find, beyond a reasonable doubt, that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer Issue 3 yes. If you do not so find or you have a reasonable doubt as to whether they do, you would answer Issue 3 no.

State Ct. R. Vol. 8 of 10 at 105-106. With respect to Issue 4 the court instructed:

> You the jury must determine how compelling and persuasive the aggravating circumstance is when compared with the totality of the mitigating circumstances. After doing so if you are satisfied, beyond a reasonable doubt, that the aggravating circumstance found by you is sufficiently substantial to call for the death penalty when [sic] considered with mitigating circumstances found by one or more of you, it would be your duty to answer the Issue yes. If you are not so satisfied or have a reasonable doubt it would be your duty to answer the issue no.

Id. at 107-08. The trial court similarly instructed the jurors for the murders of Antwon Jenkins and

Michael Kent Jones. Id. at 131-34, 157-158, 160.

Petitioner is unable to show he is entitled to habeas relief on the basis of this claim. In

Kansas v. Marsh, 548 U.S. 163 (2006), the Court held that a "death penalty statute . . . may direct

imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators

do not outweigh aggravators, including where the aggravating circumstances and mitigating

circumstances are in equipose." Id. at 172. In McDougall v. Dixon, 921 F.2d 518, 529 (4th Cir.

1990), the Fourth Circuit considered a challenge to the use of the word "duty" in instructing the jury

with respect to its consideration of the aggravating and mitigating circumstances. The court rejected

the challenge holding "[w]e find no constitutional infirmity in the use of the word "duty" to explain

the jury's responsibility to act . . . during the sentencing phase of the trial." Id.

Accordingly, petitioner is unable to show that the ruling of the Supreme Court of North

Carolina is based upon an unreasonable determination of the facts, or is contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim VI is granted.

## CONCLUSION

For the reasons stated above, the court finds that Stephens fails to establish he is in custody in violation of the Constitution or laws of the United States. He is not entitled to the relief requested and respondent is entitled to judgment as a matter of law. Accordingly, respondent's motion for summary judgment (DE #12) is GRANTED, petitioner's motion for summary judgment as to Claim I (DE #21) is DENIED, and the petition for writ of habeas corpus is DISMISSED. Further, Stephens' requests for discovery and an evidentiary hearing are DENIED.

SO ORDERED, this $\underline{27}$ day of September 2008.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE